IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

_____

UNITED STATES OF AMERICA,

      Plaintiff,

  -v-                     **CASE NO:  17-CR-313 GAG**

JUAN BATISTA JOHNSON-DEBEL,    **June 13, 2019**
NOEL DE LEON-DE LA ROSA,      **Thursday - 10:55 a.m.**
                                    **(Pages 1 - 113)**

      Defendants.

_____

**TRANSCRIPT OF JURY TRIAL PROCEEDINGS**
**HELD BEFORE THE CHIEF JUDGE GUSTAVO A. GELPI**
**JOSE V. TOLEDO U.S. COURTHOUSE, OLD SAN JUAN, PUERTO RICO**

_____

**APPEARANCES:**

**For the United States of America:**

      A.U.S.A. David Thomas Henrek

      A.U.S.A. Jose A. Ruiz-Santiago


**For Defendant (1) Juan Batista Johnson-Debel:**

      Attorney Miguel Oppenheimer


**For Defendant (2) Noel De Leon-De La Rosa:**

      Attorney Fernando Omar Zambrana-Aviles


**ALSO PRESENT:**

      Sonia C. Cardona, Courtroom Deputy Clerk

      Ani Navarro/Sylvia Zetterstrand, Court Interpreters

INDEX

**WITNESS**                                                                **PAGE**

   **DENNIS VARGAS**

Direct-Examination by Mr. Henek                                              4

   **ADRIEL CASTILLO**

Direct-Examination by Mr. Hanrek                                            13
Cross-Examination by Mr. Oppenheimer                                       27
Cross-Examination by Mr. Zambrana                                          42

   **MATTHEW JOHNSON**

Direct-Examination by Mr. Henek                                            51
Cross-Examination by Mr. Oppenheimer                                      81
Redirect-Examination by Mr. Henek                                         97
Recross-Examination by Mr. Zambrana                                      100
Re-redirect-Examination by Mr. Henek                                     106


**EXHIBITS IN EVIDENCE**

Government Exhibit  18                                                       6
Government Exhibit  18A                                                      9
Government Exhibit  19, 19A                                                 16
Government Exhibit  20                                                      17
Government Exhibit  17A, 17B                                                27
Government Exhibit  21                                                      60
Government Exhibit  21A                                                     63
Government Exhibit  21B                                                     63
Government Exhibit  22                                                      66
Government Exhibit  23, 23A                                                 70
Government Exhibit  24, 24A, 24B                                            76
Government Exhibit  23B                                                    106


Defendants' Exhibit 1                                                      103

```
 1              Mr. Henek, call the next witness.

 2              MR. HENEK:  Your Honor, the United States calls

 3    Matthew Johnson.

 4              COURTROOM DEPUTY:  Please raise your right hand.  Do

 5    you solemnly swear that the testimony that you're about to give

 6    in the case before the Court, will be the truth, the whole

 7    truth and nothing but the truth, so help you God?

 8              THE WITNESS:  I do.

 9                      DIRECT EXAMINATION

10    BY MR. HENEK:

11    Q.   Good morning.  Please state your name for the record.

12    A.   Good morning.  My name is Matthew Johnson.

13    Q.   Mr. Johnson, what do you do for a living?

14    A.   I am currently employed by the United States Environmental

15    Protection Agency as a Criminal Investigator and as a Computer

16    Forensic Examiner.

17    Q.   How long been employed with the Environmental Protection

18    Agency?

19    A.   I recently transferred from Homeland Security

20    Investigations to the Environmental Protection Agency in

21    February of this year.

22    Q.   Prior to February of this year, where were you employed?

23    A.   I was employed here, in San Juan, in the Homeland Security

24    Investigations Office also as a Criminal Investigator and a

25    Computer Forensic Agent.
```

Direct - JOHNSON                                52

1   Q.   How many years did you serve in that capacity?

2   A.   For approximately the past three years, I have been

3   working full-time as a Computer Forensic Examiner.

4        If you're not familiar, Computer Forensic Examiners is

5   someone who analyzes things like computers, cellular phones,

6   tablets for evidence.

7   Q.   Approximately, how many cell phones would you say you have

8   analyzed in your career?

9   A.   As a forensic examiner, I have analyzed approximately 200

10  mobile devices, things like cellular phones, Smart phones for

11  evidence.   The majority of that has been evidence of narcotics

12  trafficking and also frequently in Puerto Rico, ICE HSI does

13  child exploitation cases.

14  Q.   What type of training and qualifications do you need to

15  become a forensic examiner?

16  A.   As a forensic examiner, we do months and months of various

17  computer trainings.  The basic principles are identifying

18  computers, or other kind of devices, that may have evidence,

19  and recovering the evidence, which we call an extraction, and

20  we either analyze that, or we provide it to a case agent, or

21  another specialist to go through the information that we

22  recover from the devices.

23       Specifically, with cellular phones, I am certified by

24  Homeland Security to conduct mobile investigations which refers

25  to taking information from cellular phones with an application

```
 1  called Cellebrite.
 2  Q.   Are you familiar with all the different ways to conduct an
 3  extraction?
 4  A.   Yes, I am.
 5          MR. HENEK:  Your Honor, at this time, the United
 6  States would move to qualify Mr. Johnson as an expert in
 7  forensic examinations.
 8          THE COURT:  Does Defense Counsel want to voir dire him
 9  or not at this time?
10          MR. ZAMBRANA:  I have no questions, Your Honor.
11          MR. OPPENHEIMER:  Neither do I.
12          THE COURT:  He is qualified as a Forensic Examiner in
13  extractions, cell phone extractions.
14          Did I qualify him correctly, Counsel?
15          MR. HENEK:  Cell phone extractions is fine, Your
16  Honor.  I am sure his expertise goes beyond that.
17          THE COURT:  Go directly to that then.
18  BY MR. HENEK:
19  Q.   Sir, you said you were also responsible for investigating
20  narcotics-related investigations?
21  A.   Yes, I have been a Criminal Investigator for ten years.
22  This is my 17th year of law enforcement.  I did approximately
23  six or seven years with the United States Border Patrol.  For
24  the last ten years, I've been a Criminal Investigator.  The
25  majority of that time, I was Narcotics Investigations.
```

1    Q.    How many phones would you say you have analyzed related to

2    narcotic investigations?

3    A.    Specifically narcotics, at least 100.   In many of my

4    cases, I have also had phones analyzed for me as well to review

5    for evidence.

6    Q.    What, if anything, have you learned from examining those

7    phones?

8    A.    I think one of the primary things that I have learned from

9    analyzing phones that are involved in narcotics trafficking is

10   that the users of the phones typically use code words to

11   describe their activities.   After reviewing many phones, I have

12   never seen somebody who is involved in this activity use, out

13   in the open, what they're doing.

14          MR. ZAMBRANA:   Your Honor, we have an objection to his

15   testimony.  I don't think he was as an expert in interpreting

16   what is found in an extraction, rather, as an extraction

17   expert.  I think this goes beyond the scope.

18          MR. HENEK:   He is not testifying as an expert on that.

19   He is testifying as a lay person based on his training and

20   experience in narcotics investigations.

21          THE COURT:   Overruled.

22   BY MR. HENEK:

23   Q.    Continue, sir.

24   A.    So, typically, people who are involved in narcotics

25   trafficking don't speak in the open.   They do not say --

1   typically, they are obscuring who they are, their identity, the

2   product or the drug itself, maybe the location that they are

3   taking it to, and the amount.   It's, typically, because they

4   know law enforcement monitors telephones, the Internet or may

5   find it later.

6   Q.   What type of phones are they typically using or what type

7   of phones have you examined?

8   A.   Frequently, the phones I am examining have something

9   called a SIM card in it.   A SIM card, for those who are not

10  familiar, is a card that you insert in your telephone and,

11  often, your telephone number is actually on the card.

12          Often, people who are involved in drug trafficking

13  prefer SIM cards because you don't have to provide any

14  information necessarily to have the SIM card.   You don't have

15  to have an account.   You don't have to provide identification

16  or a credit card number.   You can often purchase them at a gas

17  station or a store.   You can get it from a friend, and you are

18  able to communicate without anyone knowing who is the owner of

19  that telephone or that telephone number.

20  Q.   Can a cell phone have multiple SIM cards?

21  A.   Yes, they can.   You can have multiple slots or you can

22  just replace the card any time you want and you can change your

23  telephone number.

24  Q.   When you change your SIM card, you are actually changing

25  your telephone number?

```
 1   A.   It depends on the circumstance but, frequently, you can

 2   have a different telephone number on a different card or you

 3   can even change the number on that card.

 4   Q.   Other than the SIM cards and the use of these phones, how

 5   specifically are narcotics traffickers communicating?

 6        Are they using any particular application?

 7        MR. ZAMBRANA:   Objection, I will site from the notice

 8   of intent to introduce expert testimony is that he received two

 9   GPS units --

10        MR. HENEK:   Your Honor, may we approach on that?

11        THE COURT:   Please approach.

12     [Sidebar conference:]

13        THE COURT:   I know what the notice says, so, Counsel?

14        MR. HENEK:   Your Honor, he is testifying as a lay

15   person.  We don't have any obligation to notify him in terms of

16   his testimony.

17        THE COURT:   He's not reaching a conclusion at this

18   time.

19        MR. HENEK:   He's talking about his experience.

20        MR. ZAMBRANA:   We are completely unprepared and we are

21   taken by surprise as to what he is doing right now from the

22   stand, Your Honor.  That is why we are objecting.

23        THE COURT:   Okay, but he is not giving an expert

24   opinion, so at this time I'm going to allow it.

25        (Proceedings in open court resume.)
```

BY MR. HENEK:

Q.   Sir, my question to you is whether or not narcotics

traffickers use any form of communication particularly with

respect to specific applications of narcotics traffickers?

A.   People involved in drug trafficking often use Internet

applications, things like WhatsApp, BlackBerry Messenger

because this allows to you communicate internationally.

         For instance, with your normal cell phone, you can not

communicate with people frequently in a different country, for

instance, in Colombia, Venezuela, the Dominican Republic.  But

through message applications, like, WhatsApp, you are allowed

to connect with anybody in the world internationally through

the Internet.

         One of the other features of messaging applications,

like, WhatsApp, is that the messages are also encrypted which

means they are coded so that only the receiver can decode the

message and see what you're sending them.

         You may have seen it if you're using an application

that says "these messages are encrypted."  People who are

involved in illicit activities prefer that because law

enforcement has a difficult time breaking the code in what

they're sending decrypting the message.

Q.   You mentioned WhatsApp.  Are there any other applications

that are used?

A.   WhatsApp, Blackberry Messenger, Kick.  There are dozens of

```
 1   different applications that are used.

 2   Q.   How does BlackBerry work?

 3   A.   When I'm referring to BlackBerry, it's not necessarily a

 4   BlackBerry telephone.  You can download the application

 5   BlackBerry which uses pins.  It can be on your Android phone or

 6   your iPhone, but it's using the BlackBerry messaging system of

 7   using pins.

 8   Q.   What is a pin?

 9   A.   A pin is a series of digits that you communicate with.

10   It's not someone's name.  It's a series of digits.  So it might

11   be 2bc3, just a series of numbers and letters.

12   Q.   That's some type of an identification number?

13   A.   It's used as an identification number to conduct someone.

14   Q.   Is there anything else you have learned throughout your

15   training and experience with respect to narcotics trafficking

16   in terms of methods or means by which these individuals

17   communicate?

18   A.   I think that covered it with mobile communications.

19   Q.   Sir, I am now showing you Government's Exhibit 18A and

20   page 7.  Did you conduct any extractions related to what is

21   depicted in these photos?

22   A.   Yes, I did.

23   Q.   What type of extraction did you conduct?

24   A.   I conducted an extraction on the two SIM cards that are

25   contained within the cellphone.  A cellular phone actually does
```

```
 1  not contain any information.  It's what we frequently refer to
 2  as a "burner phone" in the United States.  It's a phone that
 3  contains no information and you just put different SIM cards in
 4  that actually have maybe your contacts or messages or the
 5  different telephone numbers, but the phone, itself, has no
 6  information on it.
 7  Q.   Do you know if a previous extraction had ever been done of
 8  these two SIM cards?
 9  A.   Yes, it had been.
10  Q.   Did you review your extractions?
11  A.   Yes, I did.
12  Q.   How do your extractions compare to the previous
13  extractions that had been done?
14  A.   I conducted an extraction on the two SIM cards as well, on
15  Friday, June 7, to verify the information from the previous
16  extraction.  The previous extraction, we had the same
17  identification numbers.  That extraction had the same
18  information that was in my extraction.
19  Q.   So both extractions that came from the content that was on
20  those two SIM cards?
21  A.   That is correct.
22       MR. HENEK:  Your Honor, at this time the Government
23  moves to admit Government's Exhibit for ID 21 in evidence as
24  Government's Exhibit 21.  The Defense has seen this and has no
25  objection.
```

1          **THE COURT:**  It's admitted.

2          (Received in evidence Government Exhibit(s) 21.)

3     BY MR. HENEK:

4     Q.   What is this, sir?

5     A.   That is a typical report that is produced by an

6     application that I mentioned previously called Cellebrite.

7     This contains information about the SIM card in this case that

8     we provide to the agents to review.

9     Q.   From what phone does the SIM card originate?

10    A.   I can see this is from the ENES phone.

11         **MR. HENEK:**  Your Honor, I would also move to admit

12    into evidence Government ID 21A which is the certified English

13    translation of this exhibit.

14         **THE COURT:**  Admitted.

15         (Received in evidence Government Exhibit(s) 21A.)

16    BY MR. HENEK:

17    Q.   Sir, directing your attention to page 4 of this extraction

18    report.  What do we see here?

19    A.   So, we are seeing that they found six messages on this

20    telephone and then there is a timeline, just basically the

21    order when these messages were received or sent.

22    Q.   Based on this extraction report, are these the only text

23    messages that were found on that SIM card?

24    A.   Yes, these are the only messages that were recovered from

25    the SIM card.

```
 1    Q.   I want to start with numbers 3 through 6.  Do we know when

 2    those text messages were sent?

 3    A.   No, we don't, not from this report.

 4    Q.   Are those incoming or outgoing messages?

 5    A.   We can see where it says, "party," that it's going a

 6    telephone number.

 7    Q.   Can you please, line by line, read the messages into the

 8    record.

 9    A.   I can.  I have been in the States for a while.  But number

10    3 is (Spanish language.)

11    Q.   And the translation?

12         THE INTERPRETER:  I love you too much.

13    BY MR. HENEK:

14    Q.   The next one?

15    A.   (Spanish language)  I don't know about the spelling here.

16         THE INTERPRETER:  May it please the Court, is there a

17    certified translation?

18         THE COURT:  If you have a certified translation, use

19    that.  That's the one the Jury gets.

20         MR. HENEK:  We will publish the certified translation.

21         MR. OPPENHEIMER:  Your Honor, I haven't seen that.

22         Your Honor, may we approach?

23         THE COURT:  Please approach.

24      [Sidebar conference:]

25         THE COURT:  What's the objection?
```

1          **MR. OPPENHEIMER:**  Your Honor, as to number four,

2   certified translation says (Spanish language.)  I can't read it

3   well.  I don't know if that's an L.

4          **THE COURT:**  That's Dominican for "I'll be there in a

5   week."  It's spelled terrible, but I think the translation is

6   not correct.  No Samana.  That means in a week.

7          **MR. OPPENHEIMER:**  Or it could be Samana which is in

8   the Dominican Republic, Judge.

9          **MR. HENEK:**  Judge, we can do it one of two ways.  We

10  can either present that certified translation or we can have

11  the interpreters read it into the record.

12         **THE COURT:**  As I am looking at it, it says, "No in

13  Samana".  I think what is happening is when somebody is doing

14  the slang translation, he or she is basically putting it as it

15  is because he or she can't really interpret it.

16         Let me say this also, the jury is going to get the

17  document in Spanish.  They can see it.  They all speak Spanish.

18         **MR. RUIZ-SANTIAGO:**  I wanted, for the record reflect,

19  that we object to all jurors knows Spanish.  I think that's

20  important.

21         **THE COURT:**  Every juror here knows Spanish.

22         **MR. RUIZ-SANTIAGO:**  Many times we get Americans.

23         **THE COURT:**  Everybody from the jury pool is from

24  Puerto Rico.  They can read in Spanish.  They can read in

25  English.  Obviously, for the record, it's in English.

1          **MR. HENEK:**  Your Honor, how would you like me to

2    proceed?  Would you like me to read the certified translation

3    into the record?

4          **THE COURT:**  Use the certified translation.  I think

5    it's better.

6          **MR. ZAMBRANA:**  Your Honor, we foresee having the same

7    issue with other documents that we reviewed with brother

8    counsel here.  I'm not going to raise the objections now, but

9    I'm just letting the Court know.

10         **THE COURT:**  If there are other issues, I will take a

11   look, but again, with a different translation.

12         (Proceedings in open court resume.)

13         **MR. HENEK:**  The certified translation has been

14   admitted into evidence as 21B.

15         **(Received in evidence Government Exhibit(s) 21B.)**

16   BY MR. HENEK:

17   Q.   Mr. Johnson, I want to go through these text messages.  We

18   were looking at numbers three through six.  You have testified

19   there was no date associated with those messages you read

20   number three, "I love you too much."  Can you please read

21   number four.

22   A.   Number four appears to be "I'm in Samana."

23   Q.   How do you interpret that?

24   A.   I believe they are referring to the Samana region of the

25   Dominican Republic from my experience.

Direct - JOHNSON                                                64

```
1    Q.   Number five?

2    A.   "No in Samana."

3    Q.   Number six?

4    A.   "Okay, don't worry, I'm not going mention you."

5    Q.   Now, looking at texts 1 and 2, let's look at text number

6    two.  Was that an outgoing or incoming text message?

7    A.   That is an incoming text message according to where it

8    says "party from (829)696-8665."

9    Q.   I'm talking about text message two, sir.

10   A.   I apologize.

11   Q.   Text message two, is that an outgoing on incoming text?

12   A.   Text message number two is an incoming text message from

13   (939)270-9684.

14   Q.   939, do you know where that area code is or where that

15   originates from?

16   A.   I believe that's Puerto Rico as well.

17            MR. HENEK:  Your Honor, we would ask that the Court

18   take judicial notice that 939 --

19            THE COURT:  Is from Puerto Rico.

20   BY MR. HENEK:

21   Q.   The date that this text was incoming?

22   A.   April 18, 2017 at 10:31 a.m.

23   Q.   What does UTC mean?

24   A.   UTC minus four is our time zone that we are in.

25   Q.   Puerto Rico?
```

1   A.   It's Puerto Rico time zone, that's correct.

2   Q.   What would UTC minus zero be?

3   A.   That would be in Greenwich, England.  All time starts

4   every day in Greenwich, England.

5   Q.   In order to know the Puerto Rico time, it's minus four?

6   A.   That's correct.  We are four hours behind their time

7   depending on the time of year.

8   Q.   Sent at 10:31 a.m. sent on April 18, 2017 and what does it

9   say?

10  A.   The message reads, "it cannot be done yet."

11  Q.   Message one, is that an incoming or outgoing text?

12  A.   That is an incoming text.

13  Q.   Do you know anything about that number, where it

14  originates from?

15  A.   829 is typically a number in the Dominican Republic.

16  Q.   What time was that message incoming?

17  A.   It's on 4/18/2017 at 3:25 p.m.

18  Q.   What does the text message read?

19  A.   The text message reads, "tell me what ur doing."

20  Q.   Sir, I am now showing you Government's Exhibit 18A, pages

21  four and five.  Did you conduct an extraction of any of these

22  devices?

23  A.   Yes, I conducted an extraction on a Samsung cellular phone

24  on June 7, 2018.

25  Q.   Do you know if a previous extraction had been done?

1   A.   Yes, it had been.

2   Q.   Did you compare those two extractions?

3   A.   Yes, I compared both extractions and it has the same

4   identification indicating that had the SIM card and the

5   cellular phone, as my extraction and the same information from

6   that extraction was also in my extraction.

7        **MR. HENEK:**  Your Honor, at this time we are moving to

8   publish into evidence Government ID 22.  There is no objection

9   from the Defense.

10       **MR. ZAMBRANA:**  No, Your Honor.

11       But at this time can we approach?

12       **(Received in evidence Government Exhibit(s) 22.)**

13       **THE COURT:**  Yes, okay.  Come up.

14       (Sidebar conference.)

15       **MR. ZAMBRANA:**  Same issue here, the certified

16  translations that we have -- can I take a look?

17       **MR. HENEK:**  Your Honor, I might be able to save some

18  time.  These text messages are basically being used to

19  establish that this phone belonged to Noel.  So it's not so

20  much for the substance of the messages as it is for the mention

21  of his name.

22       **MR. ZAMBRANA:**  Can we find here the messages that

23  you're going to be using for the report, that you're going to

24  introduce later?

25       **MR. HENEK:**  That's a different issue.

```
 1              THE COURT:  Let me say this.  I need to recess for

 2    five minutes because I have a sentence at noon.  Let me recess

 3    now.  If you can discuss that among yourselves, it may be a

 4    non-issue.  Again, if it's just for the purpose, as Mr. Henek

 5    says, to show that they text him back and fourth, the substance

 6    of the other does not really matter.  He is not going to say x,

 7    y, z, I'm going to use this to incriminate him or to prove his

 8    case.  It's being used to prove they are texting to and from

 9    your client.

10              MR. HENEK:  Exactly, Your Honor.

11              THE COURT:  Let's take a recess and see if you can

12    resolve that.  We'll be back at 1:30.  If you can resolve that

13    issue, if not, we'll worry about it when we get to it.

14              MR. HENEK:  What time do you want us to come back?

15              THE COURT:  1:30.

16              (Proceedings in open court resume.)

17              THE COURT:  Ladies and gentlemen of the Jury, it's

18    almost 11:30.  I'm going to excuse you until 1:30.  We will

19    continue with this witness at 1:30.

20              The witness is under the leave of the Court.  You're

21    not to discuss your testimony with anyone; do you understand

22    that?

23              THE WITNESS:  Yes, Your Honor.

24              THE COURT:  Let's excuse the jury.

25         [The jury exits the courtroom at 11:37 a.m.]
```

1          **THE COURT:**  We are going to recess until 12 noon and

2     then I am coming out for the sentencing hearing.

3          **MR. HENEK:**  1:30, Your Honor?

4          **THE COURT:**  Yes.

5               AFTERNOON SESSION -  2:11 P.M.

6          **THE COURT:**  Please be seated.  Good afternoon, ladies

7     and gentlemen.  We are now going to continue for about an hour

8     and 20 minutes.  Then we need to recess, and tomorrow is going

9     to be a full day.  So let's proceed with your direct of this

10    witness.

11         **MR. HENEK:**  Thank you, Your Honor.

12         Good afternoon to the Court, to Defense Counsel and

13    welcome back Ladies and Gentlemen of the Jury.

14    BY MR. HENEK:

15    Q.   Mr. Johnson, before we broke for lunch, you were

16    discussing with us that you did an extraction of this phone and

17    SIM card depicted in Government's Exhibit 18A, on page 4.  Is

18    that correct?

19    A.   That is correct.

20         **THE COURT:**  Let me clarify the record.  One of the

21    gentleman's in trial last name is Johnson.  You're not related

22    to him in any way, correct?

23         **THE WITNESS:**  No, Your Honor.

24         **THE COURT:**  Okay.

25

```
 1   BY MR. HENEK:

 2   Q.   You compared it to the original extraction and the

 3   extractions were done from the same device and SIM card; is

 4   that correct?

 5   A.   That is correct.

 6   Q.   Have you had a chance to review the original extraction

 7   and any text messages from that extraction?

 8   A.   Yes, I did.

 9        MR. HENEK:   Your Honor, may I approach?

10        THE COURT:   You may.

11   BY MR. HENEK:

12   Q.   Now, showing what has been marked as Government's Exhibit

13   ID 23.  Do you recognize that?

14   A.   Yes, I do.

15   Q.   What are those?

16   A.   There's a list of select text messages from the extraction

17   from the cell phone.

18   Q.   The original extractions?

19   A.   Yes, that is correct.

20        MR. HENEK:   Your Honor, at this time I move to admit

21   Government ID 23 as Government's Exhibit 23 into evidence.

22        THE COURT:   It is admitted as Government 23.  You may

23   publish.  I guess there are certified translations that will be

24   23(a).

25        MR. HENEK:   Correct, Your Honor.
```

1          **THE COURT:**  Received.

2          (Received in evidence Government Exhibit(s) 23, 23A.)

3    BY MR. HENEK:

4    Q.    Did you determine who the owner of the cell phone might

5    be?

6    A.    Well, reviewing the text messages, there were multiple

7    messages to Nael.

8    Q.    To Nael?

9    A.    Yes, that is correct.

10   Q.    Showing you Government's Exhibit 23, let's first look at

11   number 79.  This text message right here, is this an outgoing

12   on incoming text message?

13   A.    That is an incoming message.  It says "from" indicating

14   that it's from another party.

15   Q.    On what day was that?

16   A.    It appears it would have been on April 16, 2017.

17   Q.    Can you please read that into the record.

18   A.    The text reads (Spanish language) not complete.

19          **MR. ZAMBRANA:**  Your Honor, before we go on, can we

20   approach?

21          **THE COURT:**  Yes.

22          [Sidebar conference:]

23          **MR. ZAMBRANA:**  Your Honor, I have reason to believe

24   that the Government is going to introduce into evidence two

25   pictures of two IDs attributed to my client.  I saw them for

1    the first time today.  I was explained by the Government that

2    the extractions that were produced to us during the course of

3    the case, they were in the extractions but you could not access

4    them.  Like, you click on pictures but they wouldn't blow up.

5    You could only see a thumbnail.

6            My concern is that if they are going to attribute the

7    ownership of this phone to my client, I am finding out today

8    that they are actually going to go ahead and do that.  This was

9    a wireless search.  My client didn't sign any Abandonment Form.

10           **THE COURT:**  But you didn't move to suppress.

11           **MR. ZAMBRANA:**  Because the evidence that we had was

12   this phone was listed in an Abandonment Form.  The Abandonment

13   Form was supposedly signed by Debel.  At no point was the

14   Abandonment Form signed by my client.

15           **THE COURT:**  What you're saying is that the photographs

16   pertain to your client in this phone.

17           **MR. ZAMBRANA:**  Yes, we were able to see them for the

18   first time today.  Earlier, we were talking about the evidence

19   that the Government was going to introduce, and he showed me a

20   picture of what appears to be a Dominican passport and a

21   Dominican ID driving card.  We have that concern.

22           Obviously, if we knew that that was there and the

23   Government was going to do this, we would have moved to

24   suppress in a timely fashion, Your Honor.

25           **MR. HENEK:**  Your Honor, if I may.  The extraction was

1   done ages ago.  It has been in the Government's possession

2   since the time of the seizure.  The Defense has had access to

3   all the cell phones.  There was an Abandonment Form signed

4   bonding all property.  No one showed any ownership of this

5   property.

6           The only thing we have introduced into evidence is the

7   original extraction.  We have not introduced any evidence from

8   Mr. Johnson's extraction thus far.  The cell phone extraction

9   was introduced in our very first designation evidence, Your

10  Honor.

11          **MR. ZAMBRANA:**  Actually, it was produced to us this

12  April, after or on or around the date of the last status

13  conference.

14          **THE COURT:**  It's mid June.  Two months ago, it was

15  produced.

16          **MR. HENEK:**  Your Honor, you already ruled on the

17  exclusion of the cell phone evidence.

18          **MR. ZAMBRANA:**  But, but the difference is, the

19  extraction that we were produced with, and I have the original

20  pdf file in digital format.  In the same format it was produced

21  by the Government. It does not allow us to open any pictures.

22          **THE COURT:**  The Government was not informed of that.

23  This happens all the time.

24          **MR. ZAMBRANA:**  We didn't have any reason to believe

25  that the pictures would be a problem.  You look at the thumb

1    nails and it looks innocuous.

2         **MR. HENEK:**  Those items were in the phone and they had

3    access to those.

4         **THE COURT:**  This happens all the time that the Defense

5    Counsel cannot open documents.  They bring it to the Court's

6    attention, and I say within five days, open it up and show them

7    what the contents is, and you now know what the contents was.

8         **MR. ZAMBRANA:**  My client never consented to a search

9    and no warrant was used to search his phone.  Phones are

10   subject to Fourth Amendment protections.

11        **THE COURT:**  But you were provided the Amendment Form,

12   correct?

13        **MR. ZAMBRANA:**  Apparently, it was signed by the other

14   defendant.  I'm not authenticating anything.  It has what seems

15   to be the name of Juan Johnson Debel.

16        **MR. HENEK:**  This is the white Samsung phone that was

17   disclaimed by Defendant Johnson.  No one ever claimed any

18   ownership over this phone.

19        **THE COURT:**  Nobody is claiming that's my phone at all.

20        **MR. HENEK:**  Correct, Your Honor.

21        **THE COURT:**  I'm going to allow that evidence.

22        **MR. HENEK:**  One quick issue, Your Honor.  Would Your

23   Honor like me to present the English translation on the Elmo?

24        **THE COURT:**  Show the English.  It needs to be read in

25   English.  Show the Spanish translation so the Jury can also see

1   it.

2           (Proceeding in open court resume.)

3   BY MR. HENEK:

4   Q.   Mr. Johnson, we just reviewed text message 79, which you

5   read into the record.  I'm going to show the English

6   translation of that in Exhibit 23A.

7           It says, "Thank you so much Nael for being last place

8   in Y."

9           I want to direct your attention to message 228.  Is

10  this an outgoing or incoming message?

11  A.   That is an outgoing message indicated by the "to."

12  Q.   What phone number?

13  A.   (787)639-3078.

14  Q.   What is the date?

15  A.   April 10, 2017.

16  Q.   What is the content of that text message?

17  A.   The content says nothing more than "Nael".

18  Q.   Directing your attention to text message 231.  Is this an

19  outgoing or incoming text message?

20  A.   Outgoing message to a telephone number (787)452-8707.

21  Q.   On what date?

22  A.   April 10, 2017.

23  Q.   I'm showing the English version of that at 231.  What is

24  the content of that message?

25  A.   "Elena, it's me Nael.  Wanna talk to you."

1  Q.   Now showing you message 366.  Is this an incoming or

2  outgoing text message?

3  A.   That is an incoming message from telephone (829)425-4546.

4  Q.   What's the date of the message?

5  A.   Sent on March 8, 2017.

6  Q.   Now showing you the English translation of that, what is

7  the content of that message?

8  A.   It states, "and you say you are not with her, Nael."

9  Q.   Now, showing you text message number 415; is that an

10 outgoing on incoming text message?

11 A.   That is an outgoing message to (787)644-2531.

12 Q.   Is that a Puerto Rican number?

13 A.   That is a Puerto Rican area code.  Sent on February 15,

14 2017.

15 Q.   Showing you an English translation, what is the content of

16 that message?

17 A.   "Bro, it's me Nael.  Call me please.  Need to talk."

18 Q.   Finally message 421.  Is that an outgoing or incoming text

19 message?

20 A.   That is an outgoing message to (787)673-4195.

21 Q.   What date?

22 A.   On February 7, 2017.

23 Q.   What is the content of the message?

24 A.   It states "Noel de Leon-De la Rosa."

25 Q.   Sir, you said you reviewed the original extraction in this

```
 1  case.  Did you find any other information that may indicate who
 2  the owner or user of this phone might be?
 3  A.   Yes.  Additionally, I reviewed the photographs on the
 4  phone and I observed an identification.
 5  Q.   Can you elaborate?
 6  A.   Yes, it appeared to be an identification of Noel de la
 7  Rosa.
 8  Q.   Now showing you Government's Exhibit ID 24, 24A, 24B, do
 9  you recognize these?
10  A.   Yes, I do.
11  Q.   What are these?
12  A.   Photographs of identification that I saw in a WhatsApp
13  folder.  Similar to your information at home, information on a
14  cellular phone is contained in folders.
15       For instance, you may keep music in your music folder
16  on your computer, the application WhatsApp keeps messages or
17  photographs in a folder that is labeled "sent".
18       MR. HENEK:  Your Honor, at this time, we move to admit
19  Government's Exhibits 24, 24A and 24B.
20       MR. ZAMBRANA:  Your Honor, for the record we would
21  like to lodge our objections to all of these exhibits under the
22  Fourth Amendment.
23       THE COURT:  It is noted.  You have my ruling at side
24  bar.  They are admitted.
25
```

1          (Received in evidence Government Exhibit(s) 24, 24A and

2     24B.)

3     BY MR. HENEK:

4     Q.   Now showing you Government's Exhibits 24.  You were

5     referencing certain WhatsApp messages.  Does this reflect the

6     WhatsApp messages that you were discussing?

7     A.   That is correct.

8     Q.   Drawing your attention to number 1876, what is this?

9     A.   It appears to be a WhatsApp message sent on October 1,

10    2015.

11    Q.   This Icon here, what is this?

12    A.   That is a thumbnail, a smaller representation of the

13    larger photograph, and it appears to be a Dominican passport.

14    Q.   Reviewing this information in row 1876, can you tell the

15    Court whether or not that is an incoming or outgoing message?

16    A.   That is an outgoing message because it was found in the

17    Sent folder of the application WhatsApp.

18    Q.   Now showing you Exhibit 24A, what is that?

19    A.   It appears to be a Dominican passport for Noel de la Rosa.

20    Q.   Is what is depicted in 24A, is that the same image as

21    depicted in row 1876 in Exhibit 24?

22    A.   It appears so.

23    Q.   Now showing you row 1881, what is this?

24    A.   It is also a WhatsApp message that was encountered in the

25    Sent folder on the telephone.  It was also sent on October 1,

```
 1    2015.

 2    Q.   What is this Icon here?

 3    A.   It is an Dominican electoral card.

 4    Q.   Now showing you Exhibit 24B, what is this?

 5    A.   It appears to be a Dominican cedula, electoral

 6    registration card, I believe, of Noel de Leon-De la Rosa, a

 7    national ID card.

 8    Q.   Now, earlier in your testimony, you referenced the use of

 9    pins in BlackBerries; is that correct?

10    A.   That is correct.

11    Q.   I want to direct your attention to text number 462 to 454.

12    Go up from here, 462 to 454.  Starting at 462.  What is that?

13    A.   That appears to be a pin number, a way of contacting

14    someone via BlackBerry messenger or a BlackBerry telephone.

15    Q.   And the one above it?

16    A.   I'm sorry, are you referring to 461?

17    Q.   Yes.

18    A.   It is the same.

19    Q.   And those are incoming or outgoing messages?

20    A.   Those are outgoing messages.  I'm sorry, incoming message

21    from (939)264-2289.

22    Q.   Is that a Puerto Rico number?

23    A.   Yes.

24    Q.   This would indicate a Puerto Rican number is sending a pin

25    to the user of this phone?
```

1    A.   That is correct.

2    Q.   What about above here, at Exhibit number 457?

3    A.   Number 457 is an outgoing message to (787)673-4195 sent on

4    January 12, 2017 and the contents of the message appear to be a

5    BlackBerry pin.

6    Q.   Let's go up to message 454 or 455.  Can you explain the

7    content of those messages.

8    A.   Both those messages were sent to the same telephone number

9    on the same date and the message contents states, "send me your

10   pin."

11   Q.   Is this activity consistent with what you described

12   earlier talking about the use of pins in drug trafficking?

13        MR. ZAMBRANA:  Objection, Your Honor.  Eliciting an

14   opinion beyond the scope of the notice.

15        THE COURT:  I will sustain the objection.  You can

16   either rephrase the question.

17   BY MR. HENEK:

18   Q.   Let me just go back to the text.

19        Is that use of pin, what does that indicate to you?

20        MR. ZAMBRANA:  Objection, Your Honor, same objection.

21        THE COURT:  Sustained.

22        MR. HENEK:  I will move on, Your Honor.

23   BY MR. HENEK:

24   Q.   Now, sir, did you have occasion to review a report that

25   was created by Homeland Security Investigative Agent Sonia

```
 1   Ortiz?
 2   A.   Yes, I did.
 3   Q.   In summary, what was contents of that report?
 4           MR. ZAMBRANA:  Objection, Your Honor, hearsay.
 5           MR. HENEK:  This is a report, Your Honor.  It's
 6   content.  It's not hearsay.  I'm not asking him to authenticate
 7   it.  I am asking him about the contents of the report.
 8           THE COURT:  I will sustain the objection without
 9   prejudice.  Move on or rephrase the question or lay the proper
10   foundation.
11   BY MR. HENEK:
12   Q.   Without telling me the content of the report, what kind of
13   information --
14           MR. ZAMBRANA:  That is still eliciting hearsay in
15   general.
16   BY MR. HENEK:
17   Q.   What is the content?
18   A.   The content or text messages that were in the extraction
19   report.
20   Q.   Did you review whether those text messages were in the
21   original extraction report?
22   A.   Yes, I did.  The messages were in the original extraction
23   report.
24           MR. HENEK:  Your Honor, may approach?
25           THE COURT:  Show it to Defense Counsel first.
```

1

2

3

4

5

6

7                      C E R T I F I C A T E

8          I, Robin Marie Dispenzieri, Registered Professional

9   Reporter and Official Court Reporter for the United States

10  District Court of Puerto Rico, certify that the foregoing is a

11  correct transcript from the record of proceedings in the

12  above-entitled matter.

13         Dated this 14th day of June, 2019.

14

15

16

17         /s/Robin Marie Dispenzieri

18         _____
           Robin Marie Dispenzieri, RPR
           Official Court Reporter
19         USDC for the District of Puerto Rico
           150 Carlos Chardon Street
20         San Juan, PR  00918-1767
           787-772-3000 (office)
21         305-733-5497 (mobile)

22

23

24

25